Mt. Holly Gardens Ms. Thelma? Did I put the accent right? Yes, Your Honor. Oh, it's Pomar. Good morning. May it please the Court. My name is Olga Pomar from South Jersey Legal Services, and I am appearing on behalf of the appellants, Mt. Holly Gardens Citizens in Action, and several of the individual named appellants plaintiffs. If I may, I would like to reserve five minutes for rebuttal. Granted. Ms. Pomar, I gather that there's no disagreement that the condition of Mt. Holly Gardens area now is in shambles. Yes, Your Honor. We agree that, first of all, we're not contesting the blight designation that was made years ago and has been litigated, and secondly, the township has further exacerbated the blighted conditions there by their conducting a redevelopment. Conducting what? They exacerbated the blighted conditions that already existed by their actions in initiating this redevelopment. Okay, so whatever the reason, it is now in bad shape. That is correct, Your Honor. And is it, in fact, rehabilitable now? Well, Your Honor, I think there are different ways that the redevelopment could proceed from this day forward. Obviously, we are never going to have an intact community with the original 300 homes. That community has been largely dismantled, but I think there are different approaches that could be used. Some combination of doing infill housing, upgrading some of the units, providing more affordable replacement units that the current gardens residents would be able to live in. That's a different, I mean, that's a potential way in which it can be handled. Obviously, the appellants, you argue that the people who have been dispossessed or are out for one reason or another, argue that they can't afford to go. If the redevelopment takes place the way it's currently on the books, as distinguished from five years ago, they can't afford it now, right? Yes, yes. These are people of very modest incomes. Many of them are elderly. They really have no assets other than their house, so they're in a very vulnerable position that way. Okay. How many people remain? I believe it's somewhere around 80 or 85 households. These are single-family houses? Yes. And how many houses remain in the community, in Mount Holly Gardens? I don't know exactly how many the township has demolished. Under the facts and the record, there are some 100 to 150 homes and about 80, 85 of them are still occupied. You claim that alternative development is feasible for the project? Yes. It's our position that it was always possible to approach amelioration of blight in the gardens in a different way than the township approached it. Really, the same question Judge Slobodar, I think, was asking. What is it that can be done? Well, it depends, Your Honor, if you're talking about the facts as they were when this redevelopment plan first started or whether we're talking about the facts on the ground today. I think you can go back. I don't know what. I guess you can go back, yes, for the disparity impact analysis, perhaps. Well, Your Honor, I think the reason it's important to go back is that our elements in proving a Title VIII violation under the Resident Advisory Board versus RISO test is that once we've established a prima facie case, it becomes the township's burden and the redeveloper's burden to show that there were no less discriminatory ways of conducting this redevelopment. And we've presented proof in the record that from the very beginning, going back to 2000 and continuing through this process, there are things they could have done along the way that would have made this redevelopment project have less discriminatory impacts. But instead, they arguably chose the way that had the most adverse impacts on the gardens residents. At one point, the plan was to rehabilitate, and then they changed that. Well, not exactly, Your Honor. The original gardens plan that was presented to the public in 2003 called for demolition, acquisition of all the units. The second version of the plan left open the possibility that some units could be rehabilitated. It created a rehabilitation option. That was in 2005, I think. That was in 2005. Yeah. And then something happened, and they left that possibility. Yes. At that point, they selected their redeveloper, and they worked with the redeveloper basically in designing the third version of the plan, and that version of the plan did not contain a rehabilitation option. Let me ask you a question. Is it still viable? Is there money there? I mean, given what we know about New Jersey and its fiscal problems, is it going to be in Pennsylvania? If we did nothing or if the injunction were lifted, would the redevelopment take place? Well, Your Honor, on the facts we have in the record, the redeveloper is eager to move ahead with Phase I of the redevelopment. Which is what? What is Phase I? The redevelopment area has been divided into three phases, and the land north of the gardens, which is currently vacant, there used to be a public school on it. That public school has been closed and demolished. That is where the first phase of construction is supposed to happen. It has not yet started. But from the facts in the record, every indication is that Phase I is supposed to move forward. In terms of knowing the reality of what's happening with the redeveloper and the township, we haven't had discovery in this case, Your Honor, and, you know, those facts are, you know, we don't know. In other words, there's some talk that, as I read the record, that the potential buyers or tenants aren't being given enough money because they don't have the money. And my question is, does it resolve the problem if, who would give the money? Is it the township that would have to increase the amount that's being given to the people who are displaced so that they can go back in and they can have a truly diverse area? Well, we have as the defendants in the case both the township and the redevelopers who are involved in this project. So the liability is, in essence, on all of them. In terms of what remedy or what relief the clients seek, I think it's hard to predict at this point exactly how the remedy could be fashioned. But, of course, in a Title VIII case, the court has broad authority both to issue injunctive declaratory relief and also to provide the plaintiffs with damages. So there is a way to make the residence whole, either through replacement housing, compensation sufficient so that they could buy a house in the immediate area without being displaced from the township, as is currently happening. So I think there is a variety of ways it could be addressed. Yeah, I'm interested as to whether there really is a viable remedy. I mean, because obviously we have a situation in which you have an area that is destroyed, I think, from everything that one reads. And the question is, what can a court do? Leave aside the money question, because New Jersey isn't even paying for its schools, I think. Some schools. For some schools. But what is there that we can do that will work? Well, Your Honor, I think there are different possibilities. I mean, the blight designation was based largely on the overall layout and composition of the neighborhood. It wasn't based on the conditions of individual homes. And the record will show, there are photographs and reports from our planning expert, that some of the homes are actually in excellent condition. So it could be possible to allow some of the residents to retain their homes and do new infill construction on new housing in the areas that have been vacated. That would probably be the least expensive approach. You know, are we talking something that's realistic? Or do we have to send it back to the district court, obviously, to say this is what you should aim for? It's just so hard to deal with an area where the houses have already been destroyed by the township itself. And I'm just trying to find out, what is it that we can do that will help the situation? I mean, leave aside the blame, because I don't have any question that you can find. They may not agree, but I think you can find on this record a violation of Title VIII, at least at some point. So what do we do now? Well, Your Honor, at this juncture, we're here on appeal of a grant of summary judgment. So I think the first step is to, that this matter needs to be, the district court's finding has to be reversed, the matter has to be remanded, and some guidance given to the court as to the, you know, to correct the errors that the court made in evaluating the evidence. However, we have not had a- Excuse me. There was a lot of discovery in this case. This is not a case where the district court said no discovery. There's an awful lot of evidence. Actually, Your Honor, there has never been discovery. In all the years of litigation in state court and in federal court, we have never had discovery. The information that we presented in the record is based on public information on the township's websites, documents that the township provided during the course of our litigation. What was the history, Ms. Pallmeyer? Was this a complaint that was filed and there were motions to dismiss the complaint, and this was converted to summary judgment? Yes. The procedural history of this case, actually, is the defendants never even filed an answer. The complaint was filed. We requested preliminary injunction. The defendants filed a series of motions to dismiss. The first motions to dismiss disposed of some of the claims but left the Title VIII and intentional discrimination claims intact. The complaint was amended in response to the most recent version of the redevelopment plan that came out in 2008. Then the defendants filed another motion to dismiss. That was the one that was converted to a summary judgment motion. We were given an opportunity to supplement the record at that time, but there was never discovery. There was no preliminary disclosures, no case conference. What kind of discovery would you conduct that would help us solve this problem, or help you? Help the courts. Well, it would be on the two issues. We think there is really no factual dispute with regard to establishing a prima facie case in this matter. But there are factual disputes with regard to the less discriminatory alternatives and with regard to the intent claim. I thought you put in expert reports. Yes, we did. Two expert reports. Well, don't they deal with precisely those issues? Yes, they do. Our report by Dr. Beveridge, who is a sociologist and demographer, deals with the prima facie case. He establishes the statistical pattern of disparate impact, and our planning expert, Mr. Gray-Smith, provided a lengthy report on what were the different alternatives, funding opportunities, and ways that the township could have approached this redevelopment. What's your best scenario for going forward? I mean, what's your feasible alternative? What is it that you want to accomplish at this site? Well, my primary goal for my clients is that they want to be able to remain and benefit from this redevelopment project and remain in the community or the immediate vicinity. Well, how can they do that? How do you say they can do that? Just if they're given more money so that they can afford these new fancy buildings? Well, there are three ways that they could do that. They could be allowed to stay in their home, especially if their home does, in fact, satisfy every code and show that it's in good condition, which most of the remaining homes do. They could be given replacement housing. The township has the option of attempting to build affordable housing rather than market rate units. So the township and the redevelopers, there are lots of redevelopers. Would you explain that? I don't understand what you just said. The township has the option. Repeat what you just said in words that are understandable. Okay. There are many different types of units that could be built on this site. The township and redevelopers are building predominantly market rate units, 464 market rate units. There are various subsidy programs by which a developer can build housing that is intended to be affordable to low and moderate income people. This developer or another developer? Any developer. There are ways that a development can be structured so that it has a mix of some market rate, some moderate income, some low income housing. I realize that in this day of shrinking government subsidies, it's not just a matter of how you build it. It's not that the money is easily accessible, but there still are programs, low income housing tax credits, home money, various federal programs that subsidize the construction of housing for low and moderate income people. Did the district court consider that possibility? Did the district court? No. The district court started with the premise that we hadn't made out a prima facie case.  The district court never really reached those questions of relief because he didn't get past the threshold that we had made a prima facie case. Did I step on your question? No. No, keep on going. I think I'm out of time. No, don't worry about it. You're on our time. The redevelopment plan does not include the type of mixed housing that you are proposing? No. By mixed housing, I mean different income levels? No. From what we know, the redeveloper and township have not pursued any attempts to obtain funding for any kind of subsidized housing. They did include 56 affordable units in the plan, but they didn't specify whether they would actually seek any kind of subsidy to support those units. And, unfortunately, even though those units are labeled affordable, that does not in itself guarantee that they would be affordable to our current gardens residents. It raises the question, of course, of undue burden on the municipalities. How do you address that? Well, the basic law under Rizzo is that if there is a prima facie case established, if it's shown that a municipal applicant is eligible, if that action is going to disproportionately affect a protected group, a minority group, then it's the burden of the municipality to then look and see if there is a different way they could approach it that has less discriminatory impacts. And that's where we feel the township has not met its burden. We don't deny that the township has a legitimate government interest. It wants to ameliorate blight. But they never looked to see if there was another way they could do it that wouldn't cause the kind of harm to gardens residents. Did you get to that point in the district court? Yes, we argued it. The district court really didn't recognize that there was a material issue of disputed fact with regard to this issue. I mean, we feel, first of all, that the township didn't meet its burden. But, at best, the evidence that the township produced were these statements by township officials that said, well, we've tried other things. That, at best, creates a material factual dispute. Is this a jury issue? You just want to get to a jury with this issue? Yes. But the district court did get to that step. It found that the defendant township did meet their burden and that there was no alternate design. But in doing so, he had to... Even though they maybe made a mistake on the prime official case question, they did get to step two. He did, but... And you disagree with the district court's decision on that? Well, what I think the district court did was he misapplied the summary judgment standard. Because if this case had gone to trial as a bench trial and the judge weighed the evidence and said, well, I don't really believe the planning expert that the residents presented or I believe the township's witnesses, that would be a different story. But he decided this in the posture of a summary judgment motion, where the district court should have given all the inferences in the favor of the non-moving party, which would be the residents. And if you do that, and if you don't weigh the evidence, then what you have is two competing stories. And that creates a material issue of fact that should not have been decided on summary judgment. So we think the judge's ruling on that is a legal error because it's a failure to properly apply the standard. What do you want us to do? To reverse the district court to instruct the court on why our evidence presents a prima facie case and what are the issues that are in dispute and remanded for a trial. And you put all of that in your brief? I believe so, yes. I do have a question. I just want to ask you, on the point I have, I think this is related to disparate impact. And this is from, I believe, your expert. And the statement is that African Americans are eight times more likely to be negatively affected by the plan. And Hispanics more than 11 times more likely to be negatively affected, I assume, by the conduct of the plan or imposition of the plan. Is that accurate? Where did you get that figure, eight times more likely, 11 times more likely? I assume it means more likely than whites? Yes. What that refers to is, well, our expert, Dr. Beveridge, did a four-step analysis of disparate impact. And under each test he showed a stark disparity between the impact on African Americans and Hispanics and the impact on whites. And what you're referring to refers to the second test that he used. His first test was just looking at the gardens community alone. His second test was comparing the gardens community to the township residents as a whole. And what he showed was that, first, the gardens has the highest concentration of minorities in the township. And then, while only 9.6% of all township residents lived in the gardens, it was a fairly small community. And only 2.9% of the township's white residents lived in the gardens. However, about a third, 31%, of the township's Hispanics lived there, and 21% of the African Americans in the township lived in the gardens. So the 11 times and 8 times is, 31% is 8 times 2.9, and 21% African Americans is 8.2.9. Is that clarifying? Yes, thank you. Okay, thank you. Thank you, Your Honor. I know we kept you longer, but we'll get you back on rebuttal. This is an important case. Good afternoon. Good afternoon. May it please the Court. I thought that I would try to start. You better put your name on for the record. Sorry, Jim Malley, on behalf of the township of Mount Holly. Given your questions, Your Honor, I'd like to paint a little bit of the picture, because I think it's been misrepresented a little bit about what the condition of the gardens is. First of all, it is not, and has never been, a community of single-family homes. It is townhomes. There are about, say, eight. Well, townhomes are single-family homes. Well, not the traditional detached. I mean, I live in Center City, Philadelphia, and I have people on both sides. And it's not light. Well, I'm not inferring that it is, Your Honor. Certainly the implication in New Jersey of single-family homes is the detached single-family home. And it is not detached. These are townhouses. These are groups of eight, roughly, eight or ten townhomes that would be in a block together that are all, I believe if it were apartments, it would be like garden-style apartments. They're kind of spread out throughout a neighborhood. There were, in the mid-'90s, approximately 300 of these units. Today, there are 70 occupied units. There are 30 other units that the township owns that is in the process of demolition. Now, how many of the original ones did the township demolish? I believe 230, everything from the original down to where we are today. And at the point at which you started the demolition, there was some point at which the township considered the possibility of rehabilitation rather than demolition, right? Yes, Your Honor. And what happened for the township to switch? There's two different periods. The work in the gardens, which was relied on, the record is developed. It's all there for the court. It's developed for the court. The record of rehabilitation attempts begins in the mid-'90s. Before, under New Jersey law, the redevelopment designation ever occurred. In the mid-'90s, there is plenty of testimony at hearings of the work that was done. There was a program called Mount Holly 2000. There were other rehabilitation programs that were utilized to work with the neighborhood and to try to get grant money. There were properties that were rehabbed as a result of that program. And that went through the mid-'90s until the end of the 90s. Then, in the beginning of 2000, the governing body's conclusion was that this was not working. There was insufficient funds to do the rehabilitation that was necessary. Let me ask you on that point. Didn't the state of New Jersey give the municipality of Mount Holly $2 million to use for this type of project? It was given to them under an affordable housing agreement with another town. It was not focused on this area, and it had restrictions on it that the township concluded could not be utilized here. There's a lot of factors involved. I know the allegation is made, Judge, but that is not realistic, that donation of land. And, Judge, I simply say to you, the state courts concluded that there was no evidence of any discriminatory intent in any of the redevelopment processes. Why? Wait a second. Was the issue of discriminatory intent before the state court in what type of proceeding? It was before the court. The court dismissed as not right the civil rights claims. But the court decided the questions about designation of the redevelopment area and the validity of the plan. And plaintiffs asserted that that process was tainted because of the discriminatory intent of the township. It was absolutely decided. But you don't need discriminatory intent in order to make a prima facie case of discriminatory impact. That is correct. But what you do need to show, and there's a couple different things with this disparate impact. First of all, it's what group are you deciding the impact is. And what's the official action that you were looking at to see what impact it had. And that disparate impact in every case is a disparate impact that had a segregated effect. How many different groups are there? I thought we were only talking about the Hispanics and the African Americans and the Caucasians. If I might be permitted, I would explain to you how we view this. In New Jersey law, there's two steps for redevelopment. One is blighting the neighborhood. One is a designation. Long statutory requirements to do it. It's a bit of a process to go through. The state court found blight, right? But if that's the official action, and it's not clear from plaintiffs, they kind of say choosing this area is what was the official action that had the disparate impact. What area? The gardens? Choosing the gardens area. They make reference that this is the only residential, the only redevelopment area. In essence, that the town chose this area because there were minorities in this area. I gather it was the most blighted area. Well, that's not the inference, Judge. The inference is that the choosing of this area was because there was some ill motive. There was some improper motive. That is the action that I question here. Then you look at the larger Mount Holly population to decide what the impact is. But the focus of the allegations from the plaintiffs has always been it's the implementation of the plan. They don't disagree with the blight. They don't disagree with the designation, but it's the implementation of the plan. Well, the implementation of this plan, if you accept that the blight designation is valid, that this area is blighted, it happens to be largely minority. So if it satisfies disparate impact, that if the neighborhood has a greater number of minorities and the plan that you adopt applies universally to every property in that area and that that satisfies Title VIII, then redevelopment, valid, good intention, all for the best reasons redevelopment of urban areas ends. It's done. You're saying at that point you can't show even a prima facie case? Yes, I am saying... For purposes of Step 1 on a prima facie case, don't you need to look at the entire Mount Holly community? For the designation, Your Honor, yes you do. But once you designate, even if I was to grant you that if the designation, you look at the entire Mount Holly community and the selection of this area had a disparate impact on minorities, well then, was there a legitimate government purpose? State courts say yes. And was there a less restrictive means, which means could you do this, could you pursue your valid purpose by doing something other than Didn't the district court at least err in finding that there was not a prima facie case? No, I don't believe they did because the district court focused on the plan because that's what's been argued by the plaintiffs. And when you get to the designation, it's one standard about who you were evaluating. No, they also focused on the impact of the plan on Mount Holly Gardens and its residents. But once the, if you accept that the designation was valid, Was valid. With the designation of it as blighted? Yes, there's a two-step process in New Jersey. If you designate it, it's blighted. And you accept that, it's blighted. Then the question is, I believe this is what he reviewed on this disparate impact, is when you have a neighborhood and it is, here's an example, the city of Camden, the entire city has been designated as a redevelopment area. So any plan, any plan to rehabilitate, to take over a block of homes in the city of Camden will have a disparate impact on minorities when you compare it to the entire region. If the Fair Housing Act says, let the courts take a closer look, it doesn't mean that you don't have a case. That's right. No, you take a closer look, and I submit to you that all the cases on disparate impact fall into two categories, all related to the purpose of the act, which is that there is not, that a disparate impact is serving a segregative effect. Every one of these cases, every case that finds this disparate impact has either a town with a history where they have, you know, the mayor has said we're going to keep the blacks out, they've been focusing on the Hispanic group that's been the day workers, every one of the cases, it's either that or the town has adopted and passed, taken action to stop the federally subsidized low-income housing, to take affirmative action to stop something. I don't know why that means you don't have a prima facie case of disparate impact in this case. Because it comes down to the group that you analyze. And if for the plan, if the official action is the plan, then the plan was in an area, was limited to an area that had already been designated pursuant to state law and we've already done a Title VIII analysis as to that official action. Mr. Malley, aren't you fighting a point that you don't have to prevail on to be able to uphold the district court here? Let's hear him. I fully intend to touch the other points because even if that's not correct... the other elements of this case are simply is there a valid state interest in what was done, the designation and the plan? I believe the state courts have resolved that. That's decided. And as Ms. Pomar just indicated, it's not being disputed. It's a blighted neighborhood. So then the issue is whether or not there's a less restrictive means and whether or not there's discovery necessary to find out what else should be done. Did you object to discovery? Did the township object to discovery? In the federal court case, we never got to that point because this was all done on motions to dismiss the complaint. So there was never an answer. That you filed? Yes, we have filed motions. There's been four different motions to dismiss and two or three amended complaints and there's been three voluminous motions for injunctions against the township. There is one right now. Why shouldn't we send this back and let the district court let them proceed with discovery? Because there is nothing else to be gained from discovery. In the state court, there was discovery. Well, one of the things one might try to have discovery on for the district court to focus on is is it possible to have a less restrictive alternative in language we use? Is it possible to do some kind of construction there that isn't a top level pretty housing but housing that the community that has been asked in could afford in some way and it doesn't have to be I forget the word that she used but I gather high level it doesn't have to be that high affordable housing that this community can reasonably afford so that you would have a mixed racial population. And to have discovery on that? And I go back to what you started with with what the condition of it is today. The reality of where we are today is there are 70 townhomes that are still in the gardens that are occupied. And they are scattered. They are scattered. Are they rehabilitable? From what Ms. Pomar said many of them are usable. The record before the district court is no they are not. And I give a couple different components of it. First off in the mid 90's he has the record of the mid 90's of the efforts to rehabilitate homes. Of the money that was spent. Today the only the expert reports that were provided by plaintiffs require more than substantial subsidies more than substantial subsidies in order to make any of these homes they are talking $150,000 to $200,000 of work to be done on a townhouse that would be worth $150,000. Has the district court considered those and made a finding that that cannot be done? In his decision, yes he did. Absolutely he did. He went through that and said that the plaintiffs allegations that the township established that there was less restrictive means through the record that was before him and that the plaintiffs challenges to that did not have any credibility. That all of their challenges about rehabbing all required substantial public money they could not identify where that would come from the township provided all certifications there is no public money for this. There is certain no public money to spend $100,000, $150,000, $200,000 to rehabilitate a house that will be worth $50,000, $60,000. There is no money for that your honor and I just want to add what is being done. That is just part of the plan though what is being proposed is mixed housing different values. Yes and that is what is happening. You say it would be worth $50,000 but not if you put other nice houses in the same community that are worth a little bit more. Maybe on a good day it will be worth $100,000 and there is no public there is not public subsidy out there for double or triple the value of a home that you would complete. The residents may be all wrong about this but what they are asking for is let us prove what we can prove in the district court. Your honor you have a 7 volume appendix of all of their and the question that you posed was what would you discover? Because they have everything of every developer of what is happening, what has happened what they say in their briefs they want discovery for and what they said before the district court is that they want to depose the governing body members to find evidence of intent. That is what they say in their briefs that they need discovery to find out intent. The reports are done. The reports are in. I think you don't need intent. Let's start with that. Under RZA you don't need intent and I don't think the district court will allow them to have discovery on intent. The question is can you have some kind of mixed financial feasible Let's go over what the plan is. The other day I was reading old New York Times magazine and I was reading a New York Times magazine that had in it the possibility of one kind of development or housing that was high end and another kind that was a lot less high end. You don't have to have granite in every kitchen. I think there is a real misunderstanding about the project here. About the redevelopment project that is ready to happen. The first phase is ready to go. Mount Holly is not Boca Raton. This is not Voorhees. This is not a neighborhood where these houses are being removed and $500,000 houses are being built. The amount that you would have to pay to rent one of these houses is higher than this population can afford. Is that true? Is that a fact? For some it is certainly true. Are there any being built or planned that this population could afford? Yes, absolutely. There are 56 affordable units that are required under New Jersey law to be built. That is more than the number of plaintiffs there are. 56 out of how many units are we talking about? I believe under the plan it is approximately 250 total. The plan has changed. The first phase of construction is about to start. Isn't it closer to 350? I'm sorry. 350 is not the same as 250. That is intended to be a 200 unit apartment complex. You're saying 56 out of them? 56 as required under New Jersey law. Which is more than the number of plaintiffs there are. These people can't afford that. They've been ousted. They can afford affordable housing. It depends on what you call affordable housing. If you read the briefs they can't afford it unless they get some supplementary income. I don't know where that's going to come from. That argument is made with respect to everyone that lived in the gardens. There are 230 households that have moved from the gardens. None of them are plaintiffs in this case. They've moved from the gardens because the township has demolished their homes? No, that's not what the record indicates at all. Certainly over the last couple of years some may have moved before that. These folks have moved over the last 10 years before this redevelopment ever began. One of the purchases the township made was from one landlord that owns 68 units. What is portrayed in the briefs is not necessarily supported in the record that the district court had. The district court reviewed in great detail and read through and identifies all of this paper that he went through on the public hearings. All of that they reviewed. I again just urge you that the number What has happened so far? We have never had a relocation appeal. We have never had a single... We don't have a group of former tenants or former residents that were thrown out. We've yet to use eminent domain. 230 have been acquired. We've yet to use eminent domain. That we don't have a group of residents here that have been displaced that are saying  What we have is the same group of people who challenged the redevelopment the day it happened. The day it happened. The designation happened. Well, they're the ones who can. No, Your Honor. In the briefs, they certainly make the representation that everyone in the gardens is in the same boat. And 230 households, if that's true, have been relocated, are in other housing, have found other affordable housing, and a lot of that has been done with the assistance of the township. Our relocation office works with them as required under state law. The record lays out certifications that were used in the preliminary injunction steps of this case that goes through great detail, resident after resident, about what was done and the situation that they're in today. Do you have any questions? Thank you very much. We've given everybody lots of time because we recognize this is an important case. Thank you, Your Honor. I would just like to address just a couple of statements that my opposing counsel made that I think do not accurately represent the situation facing the gardens residents. First of all, I'd just like to make clear that the state court did not ever make a finding as to the discrimination claims, either on intent or disparate impact. Those claims were brought before the state court, but the state court dismissed them as not being ripe, and never reached the merits. Not ripe, why? Because of no discovery? Well, at that point, the redevelopment plan had been adopted, but nothing had yet been done to implement it. And the state court found that because there was no selected redeveloper, because it wasn't known how many of them would be accommodated in the new community, and ultimately what would happen, that it was premature to decide whether, in fact, they were going to be displaced and whether they were going to lose their homes. So what you just said, just so I can understand it and my colleagues, is that the state court did not make a finding of discriminatory impact? Is that what you just said? No, I said the state court didn't reach the issue. He dismissed the claims without prejudice as not being ripe. So he made no finding one way or the other. The claims were dismissed as unripe. But didn't reach the issue of discriminatory impact. Was that right? Yes, he didn't reach those issues, and he dismissed them as unripe. Did the state court reach any finding of impact? No, the state court considered the question of whether the designation of blight was proper and whether the redevelopment plan complied with the local redevelopment and housing law. And it found that there was blight and it did meet local law. Yes, that's correct. And he never allowed discovery on the other issues, and he never had any kind of evidentiary hearing on the other issues. Could you touch on Keating Urban Partners and Triad and why they're still in the case? Well, Keating Urban Partners is the selected redeveloper who signed the master redevelopment agreement back in 2005. And they are the entity who has been responsible for property maintenance on the township properties. They've been working with the relocation staff to relocate residents out of the gardens. And without having had discovery, we don't know all the details of how the decisions got made. But the reasonable inference from the evidence in the record is that they played a major role in deciding exactly how this redevelopment plan was going to be implemented, what kind of units were going to be built, how many units were going to be built. It was in response to their concept plans. They came up with, I think, seven or eight concept plans. And it was in response to their concept plans that the So we believe they are a major decision maker as to how this redevelopment plan is moving forward. With respect to Triad Associates, obviously they have a much lesser role. They wrote the relocation plan and they've been involved in relocating residents. However, the reason we feel that they still need to be a defendant in the case, because again, without discovery, we don't know the exact nature of their role. So we don't know if they had any input on the substance of the relocation plan, which we think doesn't do enough to give residents a right to remain in the gardens. We don't know to what extent they have discretion in terms of where to steer people to look for housing. So in light of that, that's why we've kept them as a party in the case. Okay. Another thing that Mr. Malley mentioned is... Okay. You just have a little bit of time left. I'm going to keep you to your time. Okay. I'll make two quick points. Mr. Malley, I think, misled the court about the cost of rehabilitation. Some of these homes, as I said, are in perfect condition, and the rehabilitation estimates were based on looking at some of the worst units in the gardens, deteriorated units that had been vacant for a long time. And thirdly, we haven't really discussed the intent claim. And I realize the intent, you know, proving intent is not necessary for a Title 8 violation. But we do believe that there is ample evidence in the record from which one could infer that the township had the intention of getting rid of this minority population. Well, assuming that, what we're interested in is where we go from now, the impact. This is an impact case. Okay. Well, in that case, Your Honor, if there are no more questions, I'll... Do you know what they want us to do? Neither do I. Do you know what they want us to do? All right. Thank you very much, Your Honor. Thank you. Thank you. Thank you. We will take this matter under advisement.